# In the

# United States Court of Appeals

## For the Seventh Circuit

_____

No. 04-1762

ST. CHARLES MANUFACTURING LIMITED
PARTNERSHIP and ST. CHARLES ACQUISITION
LIMITED PARTNERSHIP,

*Plaintiffs-Appellants*,

*v.*

WHIRLPOOL CORPORATION and
WHIRLPOOL KITCHENS, INC.,

*Defendants-Appellees.*

_____

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 03 CV 1917—**Harry D. Leinenweber**, *Judge.*

_____

ARGUED DECEMBER 1, 2004—DECIDED FEBRUARY 11, 2005

_____


Before FLAUM, *Chief Judge*, and EVANS and SYKES, *Circuit Judges*.

EVANS, *Circuit Judge*. St. Charles Manufacturing Limited Partnership and St. Charles Acquisition Limited Partnership (we'll refer to both as St. Charles) sued Whirlpool Corporation and Whirlpool Kitchens, Inc. for breach of two contracts which, in part, involve cleanup of environmental contamination at a site in Illinois. In turn, Whirlpool sued St. Charles for damages under the second contract. The district court granted summary judgment for Whirlpool and St. Charles appeals. Our review of a decision

granting summary judgment is *de novo. CAE, Inc. v. Clean Air Eng'g, Inc.*, 267 F.3d 660 (7th Cir. 2001).

Under the first contract between the parties, signed in 1989, Whirlpool sold St. Charles a 12-acre parcel of land with buildings, underground storage tanks, and parking lots. The property was used by Whirlpool to manufacture kitchen cabinets. The manufacturing process involved the use of hazardous materials which contaminated the site. For that reason, the contract stated "[a]s soon as reasonably practicable, Seller will undertake, in accordance with applicable law and regulations, such remedial action as is necessary to bring . . . [the property] into compliance with applicable federal, state and local environmental laws and regulations . . . ." At some point, for financial reasons, St. Charles needed to sell the property but alleged that it could not complete the sale because the site was still contaminated. A dispute between the parties over the cleanup was settled by an agreement signed in March 2000. This agreement required Whirlpool to clean up the property and to obtain a comprehensive "No Further Remediation" letter (NFR) from the Illinois Environmental Protection Agency (IEPA). In turn, St. Charles agreed to release Whirlpool from all claims with respect to pre-existing conditions at the facility. Whirlpool obtained the NFR letter and St. Charles has now sold the property, although at a discounted price, it says, because of the nature of the NFR letter. The NFR letter is at the center of the present dispute.

St. Charles contends that the NFR letter is inadequate in that it is "voidable" because the information that Whirlpool provided to the IEPA, and on which the IEPA relied in issuing the letter, was incomplete, inaccurate, and misleading. St. Charles says Whirlpool withheld certain information and failed to provide data for the entire parcel. To support the claim that the information was incomplete and/or inaccurate, St. Charles submitted an affidavit from

a person from the environmental engineering firm, Terracon, Inc. The affidavit, St. Charles contends, was undisputed. All of which prompts St. Charles to ask us to find that Whirlpool breached the March 2000 agreement because the NFR letter was, in fact, obtained through misrepresentation or fraud and is therefore voidable, but St. Charles does not, in fact, ask us to void the letter. It is a curious argument.

To see how curious, we need to look at the Illinois statutes, which provide the basis for the NFR letter in the first place. Chapter 415 ILCS 5/58.10(a) provides that the issuance of an NFR letter "signifies a release from further responsibilities under this Act in performing the approved remedial action and shall be considered prima facie evidence that the site does not constitute a threat to human health and the environment and does not require further remediation . . . , so long as the site is utilized in accordance with the terms" of the NFR letter. Subsection (e) of the statute then provides that an NFR letter "shall be voidable if the site activities are not managed in full compliance with the provisions" of the Act. It continues by stating that "[s]pecific acts or omissions that may result in voidance of the No Further Remediation Letter include, but shall not be limited to" seven specific acts, including "(5) Obtaining the No Further Remediation Letter by fraud or misrepresentation[.]" The statute then sets out the procedures which must be followed if the agency seeks to void a NFR letter. These include notice by certified letter to the titleholder of the site; the notice must specify the cause of the voidance and describe the facts on which the agency is relying. The statute also allows for appeal of the agency action.

From this statutory scheme, we see that no NFR letter is absolute and "non-voidable." Apparently, for reasons which are not hard to imagine, the IEPA seems not to be in the business of issuing eternal and absolute warranties.

Whirlpool could not, then, have obtained anything more than it did—an NFR letter which is "prima facie evidence" that the site "does not require further remediation," but which is voidable.

The letter Whirlpool obtained is a 5-page, single-spaced document which, among other things, says that "the remedial action was completed in accordance with" the remedial action plan. It refers to the entire site "consisting of 12.0 acres." It states that the letter "signifies a release from further responsibilities under the Act for the performance of the approved remedial action." The letter is "prima facie evidence that the Remediation Site described in the attached Illinois EPA Site Remediation Program Environmental Notice . . . does not constitute a threat to human health and the environment and does not require further remediation under the Act if utilized in accordance with the terms of this Letter." Conditions for the use of the land are also set out. And importantly for our purposes, the letter also states clearly that pursuant to Section 58.10(f), should the Illinois EPA seek to void the letter, it must provide notice which specifies the cause for the voidance. The letter sets out the statutory reasons for which an NFR letter can be voided, including that the letter was obtained by fraud or misrepresentation. We have no reason to conclude that this letter deviates from other NFR letters. So, an NFR letter is, by definition, voidable. That is a far cry, however, from its being voided or inadequate to meet Whirlpool's obligations under the March 2000 settlement agreement.

Of course, as we see from both the statute and the letter itself, if Whirlpool engaged in misrepresentation or fraud in obtaining the letter, the letter could be voided by the IEPA. What is hard to see is where we come into the picture. Even were we to find that there was fraud and misrepresentation, we probably would not step on the agency's toes and void the letter, assuming we could find that we had author-

ity to do so. That is the agency's job and, perhaps for that reason, St. Charles does not ask us to declare the letter void. But St. Charles, nonetheless, wants us to find that Whirlpool committed fraud or misrepresentation before the agency as a prelude to finding that Whirlpool breached the 2000 agreement.

We decline the invitation. As a general matter, the IEPA is the agency with expertise in these matters. Officials at the agency know far better than we do what sort of documentation is appropriate to support an NFR letter. The agency issues the letter and is the proper authority to void it or to decide if Whirlpool engaged in fraud or misrepresentation in the proceeding before it.

But more importantly, in this case, the parties specifically contracted to let the IEPA decide whether the cleanup was adequate. Their contract provides that "[u]pon receipt of a 'Comprehensive' No Further Remediation letter from Illinois EPA in accordance with the terms hereof, St. Charles agrees to release Whirlpool from any and all claims in respect of pre-existing conditions at the Facility, and further agrees to indemnify Whirlpool with respect to any third party claims related to the Facility that may arise in the future." The parties put themselves in the agency's hands and agreed that Whirlpool's obligation would be satisfied by obtaining an NFR letter from the IEPA. In agreeing to this provision, St. Charles must have known that Whirlpool would obtain the letter through proceedings before the agency. In fact, St. Charles was copied on documents Whirlpool presented to the agency. Yet it did not attempt to alert the IEPA of any problems with Whirlpool's submissions. We must presume also that St. Charles knew, or at least should have known, what the statute says about the voidability of NFR letters. It is hard to see how we could find that Whirlpool breached the contract because the letter was voidable. The situation would, of course, be different were the IEPA to void the letter based on fraud or misrepre-

sentation. But, so far as we know, it hasn't. Accordingly, the decision of the district court is AFFIRMED.

A true Copy:

      Teste:

                          _____

                          ***Clerk of the United States Court of Appeals for the Seventh Circuit***